IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 16-cv-1747-WJM-MJW

SERYINA TRUJILLO,

    Plaintiff,

v.

CITY AND COUNTY OF DENVER;
ROBERT C. WHITE, in his official capacity;
JAMES MEDINA, in his official and individual capacities; and
CHERYL SMITH, in her official and individual capacities,

    Defendants.

## ORDER DENYING MOTION TO DISMISS

Invoking 42 U.S.C. § 1983 ("§ 1983"), Plaintiff Seryina Trujillo ("Trujillo") sues the City and County of Denver; its police chief, Robert C. White; a former Denver police officer, James Medina; and a current Denver police officer, Cheryl Smith, for alleged violations of her Fourth and Fourteen Amendment rights. (ECF No. 1.) Currently before the Court is a Motion to Dismiss (ECF No. 29) filed by Denver and Chief White (collectively, for purposes of this order, "Denver"). For the reasons stated below, the motion is denied.

## I. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted." The Rule 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the

plaintiff." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

## II. FACTS

The Court accepts the following allegations as true for purposes of resolving Denver's motion.

### A. Smith's and Medina's Treatment of Trujillo

On July 10, 2014, Trujillo and a friend, Daniel Adams, were eating at a Burger King in Denver. (ECF No. 1 ¶ 17.) A homeless, intoxicated man was sitting outside the Burger King, and someone called an ambulance to assist him because it appeared he was having a heart attack. (*Id.* ¶¶ 18–20.) Officers Smith and Medina also came to provide assistance (Medina was employed by the Denver Police Department at the time). (*Id.* ¶¶ 10, 19.)

Trujillo briefly exited the Burger King to ask about the homeless man's condition, but Medina told her to "back up and go back inside the Burger King," which Trujillo

2

promptly did.  (*Id.* ¶¶ 20–21.)  However, Medina soon gestured through the Burger King window that Trujillo should come back outside.  (*Id.* ¶ 22.)  Trujillo complied, accompanied by her friend, Adams.  (*Id.* ¶ 23.)  "At this point, Defendant Medina and Defendant Smith attempted to handcuff Mr. Adams, who was intoxicated, in order to take him to Denver Cares, a detoxification facility in Denver."  (*Id.* ¶ 24.)  "Not understanding why her friend was being handcuffed, [Trujillo] attempted to pull Mr. Adams away from the officers."  (*Id.* ¶ 25.)  Smith then announced that she was arresting Trujillo, and Trujillo called Smith a "bitch."  (*Id.* ¶¶ 26–28.)

A minute-by-minute narrative of what happened next is unnecessary given that nothing in Denver's motion turns on those specifics.  Suffice it to say that Smith began treating Trujillo very roughly (including slamming her to the pavement) and then handed her off to Medina, who threw her into the back of the police car, punched her in the face with a closed fist twice, and called her a "whore."  Medina then took Trujillo to the District 2 station and asked her to remove her belt and shoes, apparently as an anti-suicide precaution.  When Trujillo repeatedly refused, Medina attacked her in order to remove her belt, including by slamming her head against the cell walls and placing his knee on her neck as she was pinned (from her shoulders up) on the cell bench, causing her to black out and hit her head again when Medina finally backed away and her upper body slumped from the bench to the floor.  An investigation by the Police Department's Internal Affairs Bureau ("IAB") concluded that Medina had used excessive force, and Medina was eventually fired on account of this incident.  (*See id.* ¶¶ 28–95.)

Trujillo makes no allegation regarding whether Smith was disciplined for her part

3

in the incident. Smith apparently had no part in Trujillo's treatment after handing her off to Medina outside the Burger King.

**B.     Municipal Liability Allegations**

Trujillo seeks to hold Smith and Medina personally liable for excessive force, but also seeks to hold Denver liable under the theory that it has a custom, policy, or practice of tolerating and otherwise failing to discipline excessive force, thus emboldening officers to use such force. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). To support the latter claim, Trujillo includes the following allegations.

      1.     <u>Allegations Specific to Medina</u>

Medina spent fifteen years with DPD. (ECF No. 1 ¶ 97.) Over that time, his disciplinary history shows six instances of oral reprimand and three instances of written reprimand. (*Id.*) None of these reprimands relates to use of excessive force or anything suggesting excessive force, but rather relates to matters such as "Preventable Accident," "Obedience to Traffic Regulations," and "Attendance in Court." (*Id.*) There is also one reprimand for "Improper Procedure - Female Suspects and Prisoners," which may have some indirect relation here given that IAB found that Medina had disregarded DPD policy concerning female suspects when he entered Trujillo's holding cell alone. (*Id.* ¶¶ 47, 97.)

Trujillo requested Medina's "full IAB records," but a Denver County judge denied that request based on Medina's "right of privacy." (*Id.* ¶ 98.) The judge's order reveals, however, that "Medina's IAB record included 'an allegation of excessive force at a nightclub, two complaints of excessive force during arrest, a police shooting, and the

4

incident at issue.'" (*Id*.) Apparently putting this information together with Medina's disciplinary history, which shows no discipline based on excessive force, Trujillo alleges that DPD never disciplined Medina based on these allegations of excessive force and so Medina was "emboldened to use excessive force with impunity." (*Id*. ¶ 99.)

    2.    <u>Allegations Against DPD Generally</u>

Medina was "further emboldened," says Trujillo, "because he would have been aware of numerous fellow officers who had engaged excessive force and received [according to Trujillo] at most a slap on the wrist, pursuant to defendant Denver's culture of excessive force, lack of supervision and discipline and its ratification of the use of excessive force by its officers." (*Id*. ¶ 100.) In this regard, Trujillo recites a number of statistics, opinions of a public figure, and instances or alleged instances of excessive force.

Concerning statistics, Trujillo notes a September 2010 report to the Denver City Council that Denver had spent "nearly $6.2 million since 2004 to settle lawsuits involving Denver Police Department officers, and nearly all of the payouts were for allegations of excessive force." (*Id*. ¶ 106.) Moreover,

> Upon information and belief, at least 935 individual Denver Police Department officers were accused of excessive force through complaints filed with the IAB between 2003 and the first half of 2011; 448 DPD officers were accused of excessive force more than once; 98 DPD officers were accused 5 or more times; and 10 DPD officers were accused 10 or more times during this period.

(*Id*. ¶ 107.)

As for public figures, Trujillo quotes deposition testimony offered in a previous lawsuit by Richard Rosenthal, "Denver's Independent Monitor from July 2005 until

5

January 2012." (*Id*. ¶ 109.) According to Trujillo, Rosenthal testified, "[W]hat I saw, again, was this potential systemic problem where officers were permitted to use inappropriate force on the street, were not held accountable, would lie to Internal Affairs about it and, again, were not held accountable." (*Id*. (internal quotation marks omitted).) Rosenthal further noted

> "a number of cases" that gave him "great concern" as to whether officers were properly held accountable for their actions, stating that Internal Affairs was "particularly weak on force cases," "too willing to accept any statement from an officer and not willing to follow up to try to ensure whether it was truthful."

(*Id*. ¶ 110.) According to Rosenthal, DPD "has not established itself to be able to adequately discipline or terminate officers who should not be police officers." (*Id*. ¶ 111 (internal quotation marks omitted).)

As for other instances of excessive force, alleged or confirmed, Trujillo summarizes thirty-seven excessive force lawsuits filed against DPD, its officers, or both, between 2002 and 2011. (*Id*. ¶¶ 114–50.) Two of these cases went to a jury trial, and both juries found for the plaintiff. (*Id*. ¶¶ 114, 149.) The remaining thirty-five cases were settled, sometimes for an undisclosed amount (presumably paid by the police union insurer on behalf of individual officers), sometimes for a disclosed amount paid by Denver, and sometimes for a disclosed amount paid by an unspecified party.

With respect to three of these lawsuits, Trujillo specifically alleges that the officers involved faced no discipline, or no serious discipline, even though: in one instance, a jury found that the officer had applied excessive force (*id*. ¶ 114); in another instance, the excessive force was captured on video, and the video demonstrated that

6

the officer had lied on his report regarding the incident (*id*. ¶ 129); and in the third instance, the excessive force was captured on video and the officers involved were terminated, but Denver reinstated them (*id*. ¶ 135). Trujillo does not specify whether any discipline resulted from the alleged conduct described in the other thirty-four lawsuits.

      3.    <u>Allegations Against the Sheriff's Department Generally</u>

Trujillo also asserts that allegations of excessive force against the Denver Sheriff's Department should be considered, given that DPD and the Sheriff's Department both exist within Denver's Department of Safety. (*Id*. ¶¶ 103–04.) Concerning the Sheriff's Department, Trujillo summarizes three excessive force lawsuits and one other excessive force incident (that apparently did not lead to a lawsuit) between 2010 and 2015. (*Id*. ¶¶ 153–73.) The plaintiffs prevailed before a jury in two of the lawsuits, with one settling after trial, and the third lawsuit settled before trial. (*Id*. ¶¶ 157–58, 169, 171.)

## III.  ANALYSIS

**A.**    **Municipal Liability Claim**

In *Monell*, *supra*, the Supreme Court held that municipalities can be liable under § 1983 for damages when the municipality inflicts constitutional injury through a "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." 436 U.S. at 694. Such a policy or custom may include what is, in effect, a "policy of inaction" in the face of knowledge that municipal officials are routinely violating a specific constitutional right, thus becoming "the

7

functional equivalent of a decision by the [municipality] itself to violate the Constitution." *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (internal quotation marks omitted); *see also Monell*, 436 U.S. at 690–91 (discussing § 1983's application to "customs and usages," not just formally adopted policies and practices).

Trujillo's municipal liability claim against Denver could be characterized in at least two ways. First, Trujillo could be claiming that Denver has an unwritten policy or custom of tolerating excessive force. *See Ortega v. City & Cnty. of Denver*, 944 F. Supp. 2d 1033, 1039 (D. Colo. 2013) (finding, at summary judgment, that the plaintiffs possessed sufficient evidence of an unwritten policy or practice of tolerating excessive force); *see also Hunter v. City of Sacramento*, 652 F.3d 1225, 1236 (9th Cir. 2011) ("a custom or practice can be supported by evidence of repeated constitutional violations which went uninvestigated and for which the errant municipal officers went unpunished"). Second, Trujillo could be claiming that Denver fails to adequately supervise or discipline officers who use excessive force and/or who lie about it, thus emboldening such behavior. *Cf. Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) ("A failure to investigate or reprimand might also cause a future violation by sending a message to officers that such behavior is tolerated."). The latter theory (inadequate discipline/supervision) falls under the general rubric of "failure to train." *Estate of Reat v. Rodriguez*, 2014 WL 4358333, at *2 n.4 (D. Colo. Sept. 3, 2014) ("Allegations of inadequate discipline and/or supervision are treated as failures to train . . . ." (citing *Okolo v. Metro. Gov't of Nashville*, 892 F. Supp. 2d 931, 943 (M.D. Tenn. 2012)).

Assuming Trujillo actually intended to assert two theories,[1] the distinction between them is potentially significant because a failure to train theory requires proof of deliberate indifference, whereas a policy/custom theory does not. *See Connick*, 563 U.S. at 60–61 (describing policy/custom claims generally and then moving to the more-specific theory of failure to train and noting its deliberate indifference requirement); *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (approving the failure to train variant on *Monell* claims but announcing that the "degree of fault" required for such a claim is "deliberate indifference to the rights of persons with whom the police come into contact" (emphasis removed)); *id*. at 388 n.8 (addressing nuances of "[t]he 'deliberate indifference' standard we adopt for § 1983 'failure to train' claims"); *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (listing five variants of *Monell* liability but only mentioning deliberate indifference in connection with the failure to train variant).[2] But the Court need not distinguish Trujillo's two possible theories in this instance because the Court finds that Trujillo plausibly pleads a failure to train theory, which is the stricter of the two.[3]

---

[1] The Court makes no ruling on this issue at this time.

[2] The Court is aware that the Tenth Circuit in *Gates v. Unified School District No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993), listed deliberate indifference as an element of both a failure to train claim and a policy/custom claim. This portion of *Gates* contains no citations and no analysis of the question, and, in any event, the Tenth Circuit cannot rule contrary to the Supreme Court. Accordingly, *Gates* is not binding on the question of when deliberate indifference is an element of the cause of action.

[3] The Court is also aware of a district court decision that wrestles with the question of when deliberate indifference must be proved, and essentially concludes that it applies whenever the plaintiff pleads liability by omission (*i.e.*, failure to act), whether framed as a policy or otherwise. *See Biberdorf v. Oregon*, 243 F. Supp. 2d 1145, 1155 (D. Or. 2002). Given this Court's disposition, it need not resolve whether this is a material distinction.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. Thus, the fact

> [t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*City of Canton*, 489 U.S. at 390–91. Given all this, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate [the municipality's] deliberate indifference for purposes of [a] failure to train [claim]." *Connick*, 563 U.S. at 62 (internal quotation marks omitted). In *Connick* itself, for example, a pattern of previous violations of the duty to disclose exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), was not enough to put the local district attorney on notice of the need to train specifically regarding the need to disclose "blood evidence, a crime lab report, or physical or scientific evidence," which was the sort of evidence at issue there. *Connick*, 563 U.S. at 62–63.

*Connick* was decided on appeal from a renewed motion for judgment as a matter of law following a jury verdict. *See id*. at 57–58. Thus, the evidentiary strictness applied in *Connick* is not appropriate for this Court to apply in the present posture,

where the question is only whether Trujillo's pleadings adequately state a claim. In that light, the Court must instead inquire whether Trujillo's complaint is pleaded with sufficient plausibility to "unlock the doors of discovery." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 557–60 (discussing at length the "*in terrorem* increment of the settlement value" caused by allowing insufficiently supported claims to go to discovery).

It is fairly well-settled in this District that "[m]ere conclusory allegations that an officer or group of officers are unsatisfactorily trained will not suffice to fasten liability on the city." *Bark v. Chacon*, 2011 WL 1884691, at *3 (D. Colo. 2011) ((internal quotation marks omitted)). In addition, a plaintiff "cannot state a plausible claim of municipal liability by identifying a single incident of alleged violations and then, without any further factual substantiation, contending that such actions were consistent with and caused by a municipal policy, procedure, or failure to train." *Salazar v. Castillo*, 2013 WL 69154, at *6 (D. Colo. Jan. 7, 2013).

Trujillo has attempted to overcome these hurdles by devoting nearly half her complaint to allegations supposedly suggesting a pattern of failure to discipline for excessive force. The Court is concerned with the fact that most of Trujillo's allegations relate to incidents from 2012 or earlier. The Court is also concerned about the value of Trujillo's allegations concerning prior lawsuits, particularly those that settled. *But see Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 738 (S.D.N.Y. 2012) (allowing failure to train case to go forward at pleading stage based on accusations drawn from prior lawsuits). The Court is also uncertain about the value of allegations against the

Sheriff's Department. Nonetheless, the Court finds that a particular subset of Trujillo's allegations is enough at the pleading phase to create a plausible claim of persistent failure to discipline for excessive force and/or for lying about it on police reports, thus emboldening police officers to use excessive force.

First, Trujillo knows that Medina has been accused of excessive force at least four times, and that his disciplinary record shows no discipline based on those accusations. (ECF No. 1 ¶¶ 97–98.) Two of those accusations were specifically for excessive force in the context of an arrest, as in this case. Although all of the prior accusations may have been meritless, Trujillo has no way of knowing at this time because she has been prevented from seeing the associated IAB records. Moreover, it is reasonable to suppose that Medina's interaction with Trujillo was not the first time he displayed the "needlessly authoritarian" behavior (*id*. ¶ 161) that ultimately got him fired. Stated differently, it is reasonable to suppose that Medina had not been a restrained, cool-headed, model officer up until the point that he met Trujillo, at which point he suddenly snapped. Putting all this together, it is a fair inference that DPD was aware specifically of Medina's propensity for excessive force, and chose not to discipline him.

Second, Trujillo has cited statistics suggesting that dozens of DPD officers receive repeated complaints of excessive force. (*Id*. ¶ 107.) Obviously DPD cannot receive repeated complaints unless the officer remains employed at DPD, suggesting that DPD has not disciplined—or at least not adequately disciplined—officers based on these complaints. Some of those complaints were probably meritless, but the more that repeated complaints stack up against specific officers, the stronger the inference that something requires correction. Also, although Trujillo's statistics end in 2011, the

allegations regarding Medina specifically are minimally sufficient to suggest that the problems apparent in 2011 persist today.

Third, Trujillo has alleged one incident in which video of an alleged excessive force incident demonstrated that the officer lied about what happened, and yet the officer faced no discipline. (*Id*. ¶ 129.) Similarly, another excessive force incident was captured on video and the officers were terminated, but then reinstated. (*Id*. ¶ 135.) Again, these incidents took place approximately ten years ago, but Medina's behavior suggests that the problems persist.

Fourth, the deposition testimony of Rosenthal, the former Independent Monitor, is worth considering.[4] As with most of the previous considerations, this testimony is dated, and the Court doubts that Trujillo could rely heavily on it as such in later stages of this case. Nonetheless, coupled with the allegations specific to Medina, there is enough to suggest that the problems which existed during Rosenthal's tenure as Independent Monitor have not abated.

The Court finds that all of these allegations together raise Trujillo's claim to the level of "plausibility." *Cf. McComb v. Ross*, 202 F. Supp. 3d 11, 18 (D.D.C. 2016) ("Where plaintiff has alleged numerous instances of prior misconduct, similar to the misconduct alleged here, the Court can plausibly infer that the [municipality] had actual

---

[4] Trujillo attributes Rosenthal's testimony (*see* Part II.B.2, above) to a deposition given in a lawsuit captioned *Moore v. Miller et al.*, Civil Action No. 10-cv-0651-JLK (D. Colo., filed Mar. 19. 2010). However, the quoted passages are identical to Rosenthal's testimony given in an April 2012 deposition for a lawsuit over which the undersigned presided. *See Ortega et al. v. City & Cnty. of Denver et al.*, Civil Action No. 11-cv-2394-WJM-CBS, ECF No. 62-2 at 15 (D. Colo., July 16, 2012). The undersigned previously relied on that testimony, among other items of evidence, to find that the plaintiffs had sufficient evidence to go to a jury on the question of whether Denver had a widespread unofficial policy or practice of failing to investigate and/or discipline alleged incidents of excessive force. *See Ortega*, 944 F. Supp. 2d at 1039–40.

or constructive knowledge of the risk that the defendant officers would violate the constitutional rights of its citizens in this manner." (emphasis removed)). The Court will therefore deny Denver's motion to dismiss to the extent Denver seeks dismissal of Trujillo's municipal liability claim.

**B.      Official Capacity Claim**

Trujillo has named White as a defendant in his official capacity only, and Trujillo has named Medina and Smith in both their official and individual capacities. "A suit against a municipality and a suit against a municipal official acting in his or her official capacity are the same." *Watson v. City of Kansas City*, 857 F.2d 690, 695 (10th Cir. 1988). Accordingly, White's presence is redundant, as is Medina's and Smith's presence in their official capacities. The Court will dismiss White as a party, and will dismiss Medina and Smith to the extent they are sued in their official capacities.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Denver's Motion to Dismiss (ECF No. 29) is GRANTED IN PART and DENIED IN PART as follows:

    a. Denver's Motion is GRANTED to the extent that Defendants White, Medina, and Smith are sued in their official capacities; and

    b. Denver's Motion is otherwise DENIED;

2. Defendant White is DISMISSED in his official capacity and shall be TERMINATED as a party;

3. Defendants Medina and Smith are DISMISSED in their official capacities but shall remain as Defendants in their individual capacities; and

4. The Clerk shall amend the caption to reflect the foregoing dismissals, and the parties' future filings shall do likewise.

Dated this 14th day of April, 2017.

BY THE COURT:

William J. Martinez
United States District Judge